**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **BRIDGET KRIEMAN, ANTHONY KRIEMAN, and DARLENE KRIEMAN,** | ) | |
| **Plaintiffs,** | ) | **No. 05 C 0348** |
| **v.** | ) | **Judge Joan H. Lefkow** |
| **CRYSTAL LAKE APARTMENTS LIMITED PARTNERSHIP, CRYSTAL LAKE INVESTMENTS LIMITED PARTNERSHIP, EQUITY PROPERTY MANAGEMENT, L.L.C., and DOTTI DANCA,** | ) | **Magistrate Judge Ian H. Levin** |
| **Defendants.** | ) | |

**DEFENDANTS' MEMORANDUM OF LAW**
**<u>IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT</u>**

Defendants Crystal Lake Apartments Limited Partnership ("CLALP"), Crystal Lake Investments Limited Partnership ("CLILP"), Equity Property Management, L.L.C. ("EPM"), and Dotti Danca ("Danca") (collectively "Defendants"), by their attorney Christopher D. Oakes, Cox, Oakes & Associates, Ltd., submit this memorandum of law in support of their motion for summary judgment.

## INTRODUCTION

This is an action for violations of the Fair Housing Act ("FHA"), 42 U.S.C. §3601 *et seq.* Plaintiffs claim defendants' violated FHA §§3604(a), 3604(b), 3604(c) and 3617 during the time plaintiffs were tenants at defendants' apartment complex by subjecting them to a hostile housing environment and different terms and conditions than tenants who did not have an African-

PDF created with pdfFactory trial version www.pdffactory.com

American family member. Complaint, ¶22. The following are the different terms and conditions that plaintiffs claim they were subjected to:

1. Danca refused to answer their inquires unless they were in writing;

2. Plaintiffs were required to put repair requests in writing;

3. Defendants failed to repair plaintiffs' telephone line, leaving them without service for 3 weeks;

4. Defendants failed to repair of replace plaintiffs' water heater for six days when other tenants received new water heaters;

5. Plaintiffs' air conditioner was inoperable when other tenants units were repaired or replaced; and

6. Defendants failed to return plaintiffs' security deposit.

Complaint, ¶22.

In addition to claiming they were "forced to move," plaintiffs also claim defendants committed two retaliatory acts in response to plaintiffs' allegations of racial discrimination:

1. Danca told Bridget Krieman that defendants would not pay to have plaintiffs' telephone services repaired; and

2. Danca requested that plaintiffs pay a credit check fee after plaintiffs had a valid lease.

Complaint, ¶¶23-34.

## SUMMARY JUDGMENT STANDARDS

The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must construe all facts in a light most favorable to the nonmoving party as well as view all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

In response, the nonmoving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.*, at 324; *Insolia v. Philip Morris Inc.*, 216 F. 3d 596, 598 (7th Cir. 2000). A



PDF created with pdfFactory trial version www.pdffactory.com

material fact must be outcome determinative under the governing law. ***Insolia***, 216 F. 3d at 598-599. A bare contention that an issue of fact exists is insufficient to create a factual dispute. ***Bellaver v. Quanex Corp.***, 200 F. 3d 485, 492 (7th Cir. 2000).

Summary judgment is not a discretionary remedy. If the plaintiff lacks enough evidence, summary judgment must be granted. ***Id.***, ***Jones v. Johnson***, 26 F. 3d 727, 728 (7th Cir. 1994). The plaintiff must offer something more than a "scintilla" of evidence to overcome summary judgment, ***see Anderson***, 477 U.S. at 252, and must do more than simply "show that there is some metaphysical doubt as to the material facts." ***Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.***, 475 U.S. 574, 586 (1986).

**<u>FACTS STATED IN A LIGHT MOST FAVORABLE TO PLAINTIFFS</u>**

Anthony Krieman ("Anthony") is bi-racial. Defendants' Statement of Material Facts, (hereinafter " ¶") ¶1. He lived at Crystal Lake Apartments, Crystal Lake, Illinois from 1990 to 2003. ***Id***. Anthony's mother, Bridget Krieman ("Bridget") is white. ¶2. Bridget and her mother, Darlene Krieman ("Darlene"), also white, lived at Crystal Lake Apartments for nearly 25 years, from 1978 until 2003. ¶¶2-3.

Crystal Lake Apartments Limited Partnership ("CLALP") has owned Crystal Lake Apartments since 1989. ¶4. Crystal Lake Investments Limited Partnership ("CLILP)" is the general partner of CLALP. ¶5 Crystal Lake Apartments is a 100-unit apartment complex comprised of 12 two-story buildings. ¶4.

Equity Property Management, L.L.C. ("EPM") is a property management company that manages multi unit residential apartment complexes. ¶6. EPM has managed Crystal Lake Apartments since February 1997. ***Id.*** Dottie Danca ("Danca") was the property manager of



PDF created with pdfFactory trial version www.pdffactory.com

Crystal Lake Apartments from approximately 1995 to February 2005. ¶7. EPM hired Danca in February 1997 as the property manager. *Id.*

In 1995, Danca's management office was located directly below the Kriemans' apartment. ¶10. From their apartment, Bridget and Darlene overhead Danca numerous times making derogatory statements about Anthony's race, including the terms "nigger," "little nigger," "black bastard," and "little bastard." ¶¶11-13. [1] Bridget and Darlene also heard Danca making vulgar, demeaning jokes about African-Americans during this same period. ¶14.

Neither Darlene nor Bridget ever confronted Danca about these statements or contacted EPM about them. ¶15. At some point in the mid-1990's, however, Bridget confronted Danca, who denied making any racial statements, and after this conformation, Bridget never heard Danca make any more derogatory statements about Anthony. ¶¶18-19.

In the summer of 1996, a friend of the Kriemans, Brendan Holloran ("Holloran") overheard Danca call Anthony "that little bi-racial bastard," and on two other occasions "that little nigger." ¶16.

In December 2000, the Kriemans were delinquent in their rent. ¶¶27-31. Danca followed EPM's eviction procedures and forwarded the matter to legal counsel. ¶¶20-25, 30-31. Danca had no discretion in the steps and procedures to be followed for assessing late fees and evicting delinquent tenants, and after she sent the matter to legal counsel, Danca had no discretion or decision-making authority concerning the Krieman eviction. ¶¶20-24, 32.

After Danca forwarded the matter to counsel for filing suit and after suit was filed, Danca received a letter on behalf of St. Thomas the Apostle Church enclosing two checks totaling $530.00 to be applied to the Krieman's rent due. ¶34. Danca was instructed to accept

---

[1] Defendants have denied all of Plaintiffs' material allegations, but for the purposes of this motion for summary judgment are deemed true.



PDF created with pdfFactory trial version www.pdffactory.com

and deposit the checks. ¶35. The checks did not extinguish the balance owed by the Kriemans. ¶36.

On or about January 11, 2001, almost one month after the eviction action against the Kriemans was filed, a person named David Warren ("Warren") came to Danca's office at Crystal Lake Apartments. ¶37. Warren told Danca he was from the church that had sent money to pay for the Krieman's rent, and asked Danca to dismiss the eviction case against the Kriemans. ¶¶37-38. Danca told Warren, "It's too late. The proceedings are going…they don't' work and she has this bi-racial boy running around." ¶39. Danca repeated the statement "she has this bi-racial boy" several times. ***Id.***

On February 2, 2001, an agreed order was entered in the eviction action against the Kriemans pursuant to a settlement agreement in which the Kriemans paid EPM $192.00 as payment for the $75.00 late fee and the $117.00 in court costs in exchange for EPM dismissing the action. ¶42. Settlement of the eviction action was a decision made by Kevin Morse ("Morse"), Danca's immediate supervisor. ¶27, 44.

About four months after the eviction case was settled, Morse received from the Krieman's counsel, affidavits from Holloran and Warren setting forth Danca's discriminatory statements. ¶46. Morse investigated the matter and determined the allegations to be frivolous. ¶47.

In August of 2001, Danca received a notice from the McHenry County Housing Authority dated August 3, 2001, informing her that Darlene's Section 8 housing assistance was being terminated because Darlene had committed fraud by not reporting income. ¶48. Danca then requested that the Kriemans pay a credit check fee of $30.00 so that she could review their credit. ¶¶49-52. The Krieman's objected to Danca's credit fee request because they already



PDF created with pdfFactory trial version www.pdffactory.com

signed a new lease, the request was withdrawn, and the Kriemans never paid a credit check fee. ¶¶53-54.

In 2002, the Kriemans were without a water heater for about 4 or 5 days. ¶72. The Kriemans paged Jaime DeAlba ("DeAlba"), the primary maintenance employee at Crystal Lake Apartments, because they had no hot water. ¶61. DeAlba remembers that the request was made on a Thursday. *Id.* DeAlba immediately responded to the request that day and attempted to fix the water heater. *Id.*, ¶¶62-64. Bridget denies DeAlba ever attempted to fix the water heater and that days went by before EPM responded to their service call. ¶71. Darlene contradicted Bridget, stating that DeAlba came to their apartment within one-half hour of the first call. *Id.*

Danca told Darlene no water heaters were in stock and that she would have to obtain new water heaters. ¶68. Danca ordered 4 new water heater units that same day, which were delivered the following Monday. ¶69. When the units were delivered that Monday, DeAlba installed a new water heater unit in the Krieman's apartment unit that same day. ¶70. Darlene stated the new water heater was installed within a day or so of Danca telling her there were no new water heaters in stock. During the time that the Krieman's water heater was not working, no other tenants received new water heaters. ¶67.

In late April 2002, Bridget called Danca to demand that Crystal Lake Apartments pay to repair her telephone service, which apparently was not working. ¶79. Bridget claims Danca told her that Crystal Lake Apartments would not pay to repair the telephone line. *Id.* Morse told Danca to tell Bridget to put a telephone repair request in writing so that Morse could investigate the matter and determine whether the property was responsible for the repair. ¶¶77-78, 80.

Morse reviewed Bridget's letter, had the matter investigated by repair personnel, determined the problem was the responsibility of Crystal Lake Apartments and instructed Danca



PDF created with pdfFactory trial version www.pdffactory.com

to tell Bridget Krieman in writing that the problem would be corrected. ¶81. Danca then wrote a letter to Bridget Krieman on May 8, 2002 advising her that the telephone company would repair her phone line on May 9, 2002 at no cost to her. ¶82. The telephone line was repaired on May 9, 2002, and EPM paid the invoice for this repair at no cost to the Kriemans. ¶83.

The Kriemans claim that their air conditioner did not work in the summer of 2002. ¶84. Darlene claims the air conditioner kept breaking down and that DeAlba's attempts to fix it did not resolve the problem. *Id.* Darlene claims the air conditioner was inoperable for a month in June 2002. *Id.*

The Krieman's air conditioning unit did not require replacement in 2002, and at that time was less than 10 years old. ¶93. Only units that exceeded their useful life were periodically replaced, and the Krieman's unit in 2002 was not in this category. ¶94. Danca specifically remembers the Kriemans receiving a new air conditioning unit after she began working at the property. ¶93.

In June 2002, LEA Heating & Air Conditioning Co., Inc. serviced the Krieman's air conditioning unit. ¶88. After the unit was serviced by LEA Heating & Air Conditioning Co., Inc., EPM received no further repair requests from the Kriemans. ¶92. *Id.* There is no record or other documentation that the Krieman's air conditioning unit was inoperable for any extended period of time. ¶89. At no time did EPM or Crystal Lake Apartments ever fail to properly repair or replace the Krieman's air conditioner during a time period when other tenants received new air conditioners. ¶90.

EPM filed an eviction action against the Krieman's for non-payment of rent in March 2003. The Krieman's security deposit in the amount of $500.00 was not returned to them after they vacated their apartment unit in about May 2003 because they were evicted for failure to pay



PDF created with pdfFactory trial version www.pdffactory.com

rent and owed money to EPM. ¶98. Darlene signed an agreed order on March 26, 2003 acknowledging that the Kriemans owed delinquent rent to EPM and that if they failed to pay the balance due a judgment order would be entered against them. ¶99. Bridget denies she signed the order, but she admits her presence in court that day, and did not object on the record to the entry of the order. *Id.*

After March 26, 2003, the Krieman's failed to pay EPM the balance due, and an additional agreed order was entered on April 23, 2003, signed by both Bridget and Darlene, in which EPM obtained a money judgment against them in excess of $1,600.00, which remains unsatisfied. ¶100. The $500.00 security deposit was credited against the balance due EPM. *Id.*

## ARGUMENT

### A. Plaintiffs Cannot Prove They Were Denied Housing or Treated Differently in the Terms and Conditions of Their Housing in Violation of Sections 3604(a) or (b) of the FHA.

To establish a cause of action under §3604, a party must prove that he or she was discriminated against because of race. *Washington v. Sherwin Real Estate, Inc.*, 694 F.2d 1081, 1089 (7th Cir. 1982)(evidence showed that defendant's refusal to rent was because of plaintiff's belligerent conduct, not his race). Here, the Kriemans cannot prove they were discriminated against because of Anthony's race.

The elements of an action alleging housing discrimination closely follow the elements for an action alleging employment discrimination under Title VII. *Wills v. Becvar*, 1998 WL 560283 (N.D. Ill. slip op. 96 C 89, Aug. 26, 1998) at 4; See *Kormoczy v. Secretary, U.S. Dept. of Housing and Urban Development*, 53 F. 3d 821, 823-824 (7th Cir. 1995). Plaintiffs may establish that defendants "had a discriminatory intent either directly, through direct or



PDF created with pdfFactory trial version www.pdffactory.com

circumstantial evidence, or indirectly, through the inferential burden shifting method known as the *McDonnell Douglas* test." *Id.* at 842.

Under the direct method, plaintiffs may introduce either direct evidence or circumstantial evidence of discrimination. *Id.* When direct evidence is used to show that a housing decision was made in violation of the statute, "the burden shifting analysis is inapposite." *Id.* "Direct evidence is that which can be interpreted as an acknowledgment of the defendant's discriminatory intent." *Id.* The Seventh Circuit has defined "direct evidence" as evidence, which "if believed by the trier of fact, will prove the particular fact in question without reliance upon inference or presumption." *Bahl v. Royal Indemnity Co.*, 115 F. 3d 1283, 1290 n. 6 (7th Cir. 1997).

Under the indirect method *McDonnell Douglas* test, a plaintiff must first establish a prima facie case of discrimination. *See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).* If a plaintiff succeeds in establishing a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the action taken against the plaintiff. *Id.* If the defendant's reasons are nondiscriminatory on their face, then the plaintiff has the burden of demonstrating that those reasons are not true. *See Kariotis v. Navistar International Transportation Corp.*, 131 F. 3d 672, 676 (7th Cir. 1997). In other words, the plaintiff must show that the reasons were pretextual. *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 507-508. (1993).

Here, there is no direct evidence that can be interpreted as an acknowledgment of the defendants' discriminatory intent. Furthermore, under the indirect method analysis, plaintiffs cannot set forth any adequate evidence that defendants nondiscriminatory reasons for its conduct is pretextual and therefore not true.



PDF created with pdfFactory trial version www.pdffactory.com

**1. Plaintiffs Cannot Prove Defendants Violated Section 3604(a).**

There are simply no facts pleaded or evidence to support plaintiffs' §3604(a) claim in Count I of their complaint. Defendants never denied the Kriemans housing. On two occasions, December 2000 and March 2003, eviction actions were filed against the Kriemans for non-payment of rent. In both instances, it is indisputable that the Kriemans were delinquent in paying rent. The first action was dismissed by agreement because after the case was filed the Kriemans substantially paid the balance due. ¶¶42-44. The second action resulted in an agreed judgment order against the Kriemans because they admittedly owed rent, which they did not and to this day have never paid.

Moreover, for the reasons set forth below in Section 5 of this Memorandum, the Kriemans are barred from relitigating these eviction actions under section 3604(a) of the FHA.

**2. Evidence of Danca's Racial Slurs Made in 1995 or 1996 is Time-Barred by the Two-Year Statute of Limitations.**

The gist of the remainder of plaintiffs' claims is that they were treated differently than other tenants because of Anthony's race. To prove this, plaintiffs infer that all of defendants' actions or omissions are somehow attributable to Danca's racial animus towards them.

In support of their claim, plaintiffs point to Danca's racial slurs. Reliance on these slurs, however, is not helpful to plaintiffs because they are time barred by the two-year limitations period of section 3613(a)(1)(A) of the FHA.

The FHA requires that a suit be filed within two years "after the occurrence or the termination of an alleged discriminatory housing practice." 42 U.S.C. § 3613(a)(1)(A). In *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 380-381 (1982), the Supreme Court recognized the applicability of the "continuing violation" doctrine to the FHA (explaining difference between the plaintiff who challenges one incident of unlawful conduct and the plaintiff who



PDF created with pdfFactory trial version www.pdffactory.com

challenges an unlawful practice, and holding that the latter is continuous and may toll the period of limitations).

"A continuing violation may be found where there is proof of specific ongoing discriminatory policies or practices, or where specific and related instances of discrimination are permitted ... to continue unremedied for so long as to amount to a discriminatory policy or practice." *Cornwell v. Robinson*, 23 F. 3d 694, 704 (2nd Cir. 1994). Thus, where a plaintiff's claim is based on an ongoing policy as opposed to a discrete incident, a continuing wrong is present. *See Association Against Discrimination v. City of Bridgeport,* 647 F. 2d 256, 274-275 (2nd Cir. 1981).

Here, plaintiffs claim Danca made racial slurs about Anthony, and African-Americans generally, in about 1995 or 1996. After Bridget confronted Danca in the mid-1990's, she never heard Danca make any further racial slurs. Another five years transpired before Danca made another statement that could be construed as racially insensitive. This occurred when she referred to Anthony in January 2001 as a "bi-racial boy" when speaking with Warren about the recently filed eviction action against the Kriemans.

There are simply no discriminatory housing practices or policies to be found during this five-year period to claim a continuing violation. At most Danca's statements were discrete incidents and therefore no continuing wrong was present.

**3. Danca's Statement to Warren is not Evidence of Defendants' Discriminatory Conduct.**

Evidence of discriminatory motives must have some relationship with the decision in question. *See Venters v. City of Delphi*, 123 F. 3d 956, 973 (7th Cir. 1997)(employment discrimination context). Inappropriate but isolated comments that amount to no more than "stray remarks" will not do. *Id.*



PDF created with pdfFactory trial version www.pdffactory.com

A slur is not in and of itself proof of actionable discrimination, even if repeated. ***Shager v. UpJohn Co.***, 913 F. 2d 398, 402 (7th Cir. 1990). A remark taken to be a slur may have been innocent and misunderstood; or it may have had no consequence either because it did not reflect the thinking of the people with decision-making authority or because it did not motivate even the person uttering it to act on it. ***Id.***

*See e.g. Sultan v. American NTN Bearing Manufacturing Corp.,* 2002 WL 548723 (N.D. Ill. slip op. 00 C 5753, April 8, 2002)(defendant employer entitled to summary judgment where there was no evidence that any of the derogatory remarks were related to the specific employment decision in question, plaintiff's termination) and *Apelbaum v. Northeast Illinois Regional Commuter Railroad Corp.*, 2003 WL 132503 (N.D. Ill. slip op. 00 C 7831, Jan. 16, 2003)(no evidence that various derogatory comments were related to defendant's employment decision to terminate plaintiff).

In the present case, Danca's statement to Warren in January 2001 is not evidence of defendants' discriminatory conduct. EPM filed an eviction action because the Kriemans were undisputedly delinquent in paying rent. Danca had no discretion in this process, and at the time she spoke to Warren, a month after the process started, Danca had no decision-making authority over the matter.

There is no evidence that Morse, the decision-maker, knew of Danca's statement when made or that it had any effect on the decision to file suit. To the contrary, Morse was provided with Warren's affidavit months later, after the eviction case was dismissed and the matter concluded.

Furthermore, there is no evidence that Danca manipulated Morse, concealed relevant information or influenced the decision-making process, that is, the decision to file suit. Only in



PDF created with pdfFactory trial version www.pdffactory.com

situations where a subordinate, by concealing relevant information from the decision-maker, is able to manipulate the decision-making process and influence the decision may the forbidden motive of the subordinate employee be imputed to the employer. *See Myrick v. Aramark Corp.*, 2004 WL 906176 (N.D. Ill. slip op. 02 C 5890, April 28, 2004).

### 4. Plaintiffs' Claims That Their Maintenance Issues Were not Properly Addressed Because of Some Vague Discriminatory Intent are Wholly Without Evidence.

There is simply no evidence that EPM's response and actions to the Krieman's various maintenance requests had any relationship to discriminatory motives. The Krieman's telephone line was repaired at no cost to them. It took EPM a few days to replace the Krieman's water heater because no new units were in stock when DeAlba determined the unit was not repairable. And the Krieman's air conditioner was timely serviced. All of the documentary evidence supports the conclusion that the Krieman's maintenance issues were addressed in a racially neutral manner and that the Kriemans were not treated differently.

It is too remote to suggest or infer that any of these discrete maintenance incidents are related to Danca's slurs that occurred years earlier. It is equally remote to link DeAlba, who was the person responsible for responding to the Krieman's maintenance requests, not Danca, with Danca's prior conduct or racial animus. Speculation is not a sufficient defense to a summary judgment motion. *Karazanos v. Navistar International Transportation Corp.*, 948 F. 2d 332, 337 (7th Cir. 1991).

In addition, plaintiffs' claim that they were treated differently because Danca required them to put repair requests in writing and that Danca refused to communicate with them unless the request was in writing is false. Compliant, ¶22 (a) and (b). Plaintiffs own documents belie their baseless allegations.



PDF created with pdfFactory trial version www.pdffactory.com

Bridget stated in her letter to Danca about her telephone line problems that Danca returned her call the same day and therefore plaintiffs cannot by their own admission prove that Danca refused to orally communicate with them. ¶80. And simply because in this one instance Morse specifically told Danca to asked Bridget to put her request in writing for a nondiscriminatory reason is not a violation of section 3604(b) of the FHA. Moreover, it was Danca's normal procedure at Crystal Lake Apartments to request that tenants put requests in writing, and so the Krieman's were treated the same as other tenants. ¶76.

**5. Plaintiffs are Barred Under the Doctrine of *Res Judicata* or Alternatively the District Court Lacks Subject Matter Jurisdiction Under the Rooker-Feldman Doctrine Over the Plaintiffs' Claim That They Were "Forced" to Move.**

Integral to each of the Krieman's claims under the FHA is that they were "forced to move," and defendants failed to return their security deposit. Complaint, ¶¶22, 24. Both claims are barred by the doctrine of *res judicata.*

Plaintiffs agreed, pursuant to the terms of agreed consent order entered on March 26, 2003 to the entry of a judgment against them for all amounts due and owing EPM. ¶100. After plaintiffs failed to satisfy the provisions of the March 26th order, an agreed judgment was entered against them on April 23, 2003, and their security deposit was offset against the balance due EPM. ¶100. The consent order and agreed judgment order are conclusive with respect to the eviction matter.

Under Illinois law, an order entered by consent of the parties operates to the same extent for purposes of *res judicata* as a judgment entered after consent, because it is conclusive with respect to the matters settled by the order or judgment. *Elliott v. LRSL Enterprises, Inc.*, 226 Ill.



PDF created with pdfFactory trial version www.pdffactory.com

App. 3d 724, 728, 589 N.E.2d 1074 (2nd Dist. 1992).[2] Therefore, the Krieman's cannot relitigate the March 2003 eviction action and are precluded from claiming they were forced to move or entitled to the return of their security deposit.

Alternatively, this court lacks subject matter jurisdiction over the Krieman's claim that they were "forced to move" under the Rooker-Feldman doctrine. The Rooker-Feldman doctrine rests upon the principle that as courts of original jurisdiction, federal courts are without the authority to sit as an appellate tribunal of the state court process. *See Fayyumi v. City of Hickory Hills*, 18 F. Supp. 2d 909, 912-917 (N.D. Ill. 1998)(court lacked subject mater jurisdiction under the Rooker-Feldman doctrine over plaintiffs' §3604 claim that were wrongfully evicted in a state court forcible entry and detainer action because it was inextricably intertwined with the state court's judgment that defendants were entitled to possession due to plaintiffs' non-payment of rent).

**6. Danca's Request that Plaintiffs Pay a Credit Check Fee After Danca Learned Darlene Committed Section 8 Housing Fraud was not a Violation of the FHA.**

The Krieman's bare allegation that defendants retaliated against them for making allegations of racial discrimination by demanding a credit check fee is wholly unsupported by the evidence.

Danca received a notice from the McHenry County Housing Authority dated August 3, 2001, informing her that Darlene's Section 8 housing assistance was being terminated because Darlene had committed fraud by not reporting income. ¶48. As a result of this letter, Danca requested that the Kriemans pay a credit check fee of $30.00 so that she could review their credit, which was nevertheless rescinded. ¶¶49-52. Plaintiffs allege that this request is somehow

[2] *See also Jackson v. Callan Publishing, Inc.*, 356 Ill. App. 3d 326, 340, 826 N.E.2d 413 (1st Dist. 2005)(recognizing the modern view that a valid consent judgment is entitled to a *res judicata* effect, so as to preclude relitigation of the same claim or cause of action.



PDF created with pdfFactory trial version www.pdffactory.com

in retaliation for the June 18, 2001 letter enclosing the Holloran and Warren affidavits is at best far fetched. Complaint, ¶¶18, 21. There is no evidence Danca even had knowledge of the existence of the June 18, 2001 letter when she asked the Krieman's to pay the fee, and to infer otherwise without any proof is pure speculation.

**B. Plaintiffs Have Failed to Allege any Facts or Produce any Evidence in Support of Their Claims in Counts III and IV for Violations of Section 3604(c) and 3617 of the FHA.**

Section 3604(c) of the FHA provides, in part, that it is unlawful to make, print or publish any discriminatory notices, statements or advertisements. ***See*** 42 U.S.C. §3604(c). Similarly, section 3617 of the FHA provides that it is unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of; or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted by the FHA. 42 U.S.C. §3617.

Here, plaintiffs claim defendants' violated sections 3604(c) and 3617 of the FHA (Complaint, Counts III and IV). Absent from the Complaint, however, is a single fact to support a claim for violation of either section. Nowhere do plaintiffs allege defendants made or caused to be made any printed discriminatory materials or engaged in any other conduct in violation of section 3604(c). Likewise, plaintiffs have failed to plead a single allegation of intimidation or coercion or similar prohibited conduct under section 3617 against any person in connection with plaintiffs' rights under the FHA. Defendants are entitled to summary judgment on Counts III and IV.

**C. Plaintiffs' Hostile Housing Environment Claim in Count V is Meritless.**

A hostile housing environment claim is action when the offensive behavior unreasonably interferes with the use and enjoyment of the premises. *DiCenso v. Cisneros,* 96 F. 3d 1004, 1008



PDF created with pdfFactory trial version www.pdffactory.com

(7th Cir. 1996)(conduct was not sufficiently egregious to create an objectively hostile housing environment). Isolated incidents do no support a discrimination claim. *Id.*

Here, Danca's infrequent inappropriate behavior is not sufficiently egregious to create a hostile housing environment. Most of her statements are very old, so old they are barred by the two-year limitations period under § 3613(a)(1)(A). And Danca's later statements and actions are sporadic and cannot objectively be considered abusive. Frequency of the offensive behavior is a key element that is missing here. *DiCenso*, 96 F. 3d at 1008.

Moreover, the evidence of defendants' response to the Krieman's maintenance requests in no way supports a hostile housing environment claim. Defendants' management of the property was not perfect, but this is not the standard by which their conduct is measured

**CONCLUSION**

For all the above reasons, and based on the supporting evidence, this court should enter a judgment as a matter of law in favor of Defendants and against the Plaintiffs on each Count of their Complaint.

Dated: October 25, 2005

**CRYSTAL LAKE APARTMENTS LIMITED PARTNERSHIP, CRYSTAL LAKE INVESTMENTS LIMITED PARTNERSHIP, EQUITY PROPERTY MANAGEMENT, L.L.C. and DOTTI DANCA,**

By: s/Christopher D. Oakes
One of their attorneys

Christopher D. Oakes
Cox, Oakes & Associates, Ltd.
3330 Dundee Road, Suite S-3
Northbrook, Illinois 60062
(847) 498-2690
Attorney No. 06195692
O:\DATA\SHARED\CLIENTS\9400 - Crystal Lake\9400-80A - Krieman HUD Complaint\Summary Judgment Memorandum.doc



PDF created with pdfFactory trial version www.pdffactory.com