UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BRIDGET KRIEMAN, et. al. | ) | |
| | ) | |
| Plaintiffs, | ) | No. 05 C 0348 |
| | ) | |
| vs. | ) | Judge Joan H. Lefkow |
| | ) | |
| CRYSTAL LAKE APARTMENTS ) | ) | Magistrate Judge Ian H. Levin |
| LIMITED PARTNERSHIP, et. al. | ) | |
| | ) | |
| Defendants, | ) | |

**DEPOSITION 1 OF JOHN COX**

Date: October 26, 2005

**DEFENDANT, OWNER OF**

**EQUITY PROPERTY MANAGEMENT, L.L.C.**

Page 2

APPEARANCES:
JOHN MARSHALL LAW SCHOOL,
FAIR HOUSING LEGAL CLINIC,
BY: MR. JOSEPH R. BUTLER,
(28 East Jackson Boulevard,
Chicago, Illinois 60604)
Appeared on behalf of the Plaintiffs;

LAW OFFICES OF COX, OAKES & ASSOCIATES LTD.,
BY: MR. CHRISTOPHER D. OAKES,
(3330 Dundee Road,
Northbrook, Illinois 60062)
Appeared on behalf of Defendants.

Page 3

I N D E X



| | EX | FX |
|---|---|---|
| LIST OF WITNESSES: | | |
| JOHN COX | | |
| by Mr. Butler | 4 | |

EXHIBITS

| | ID | EVD |
|---|---|---|
| Exhibit No. 1 | 11 | |
| Exhibit No. 2 | 13 | |
| Exhibit No. 3 | 16 | |
| Exhibit No. 4 | 19 | |
| Exhibit No. 5 | 22 | |
| Exhibit No. 6 | 23 | |
| Exhibit No. 7 | 24 | |
| Exhibit No. 8 | 28 | |
| Exhibit No. 9 | 31 | |


Page 4

(Witness sworn.)

JOHN COX,

called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. BUTLER:

**Q. Could you please state your name and spell your name for the record?**

A. John H. Cox.

**Q. And Mr. Cox, have you ever given a deposition before?**

A. Yes, I have.

**Q. And on how many occasions have you given a deposition?**

A. A handful.

**Q. Let's just go through for the record what a deposition is about. I'm going to ask a series of questions, and I'd ask if you don't understand the question that I ask, please let me know so we have a clear record; is that okay?**

A. Sure.

**Q. And of course the court reporter has a difficult job taking down everything, so please keep your responses verbal rather than head nods**

Page 5

**and those sorts of things.**

A. Nobody has ever accused me of not being verbal.

**Q. Mr. Cox, have you ever met any member of the Krieman family?**

A. I don't think so.

**Q. Have you ever spoken with Bridget Krieman?**

A. I don't think so.

**Q. Have you ever spoken with Anthony Krieman?**

A. I don't think so. I make a lot of visits to the property so I could have spoken to anybody. Sometimes I know their names, sometimes I don't.

**Q. And Mr. Cox, I just want to ask you some questions about the various entities that defendant noticed in the case.**

**First of all, what is your relationship to Equity Property Management?**

A. I'm the owner. It's an LLC by the way. I'm the sole member.

**Q. And how many people are employed by Equity Property Management?**

Page 6

A. I don't know the exact number.
**Q. Do you have a ballpark figure?**
A. I have a difficult time probably answering that because the property may employ the employees or the company. I don't recall actually how it was all set up.
**Q. And how long has EPM, and when I say EPM I referring to Equity Property Management.**
A. I understand.
**Q. How long has EPM existed?**
A. I believe seven or eight years.
**Q. So, it was founded in 1998 or thereabouts?**
A. I don't recall the exact date.
**Q. And could you describe briefly the structure of the organization? You're the owner and who reports to you.**
A. Well, EPM is an LLC, I'm the a sole member and I'm the president.
**Q. And does anyone report directly to you at EPM?**
A. Kevin Morse. You're speaking as of today?
**Q. Correct.**

Page 7

**And how long has Mr. Morse been with EPM?**
A. I don't recall the exact time.
**Q. And Mr. Morse's title is what?**
A. Vice president I think now.
**Q. And before Mr. Morse was vice president, who fulfilled his duties at EPM?**
A. I don't recall. There was somebody that preceded him but I don't remember the name.
**Q. And Mr. Cox, what is your relationship to Crystal Lake Investments Limited Partnership?**
A. Crystal Lake Investments Limited Partnership is the general partner of Crystal Lake Apartments Limited Partnership.
**Q. And what is your relationship then to Crystal Lake Investments Limited Partnership?**
A. In what context?
**Q. In a business context.**
A. Me personally?
**Q. Correct.**
A. I am the president of Financial Equity Associates, Inc., which is the general partner of Crystal Lake Investments Limited Partnership.
**Q. And could you just repeat the Financial**

Page 8

--
A. Equity Associates, Inc.
**Q. And how long has Crystal Lake Investments Limited Partnership existed?**
A. Since I believe 1989.
**Q. And what is your relationship with Crystal Lake Apartments Limited Partnership?**
A. I just told you. Crystal Lake Apartments Limited Partnership owns the property in Crystal Lake on Woodstock in Crystal Lake, and I'm the president of Financial Equity Associates, Inc., which is the general partner of Crystal Lake Investments Limited Partnership.
Crystal Lake Investments Limited Partnership is the general partner of Crystal Lake Apartments Limited Partnership, which owns the real estate.
**Q. And currently what entity is the property management company of Crystal Lake Apartments?**
A. Equity Property Management, LLC.
**Q. And how long has Equity Property Management, LLC been the management company of Crystal Lake Apartments?**
A. I don't recall the exact time.

Page 9

**Q. And at some point was the Habitat Company the property management company at Crystal Lake Apartments?**
A. Yes.
**Q. And what was the relationship between the Habitat Company and Financial Equity Associates?**
A. There was no relationship.
**Q. So, who was it that hired the Habitat Company to manage Crystal Lake Apartments?**
A. Crystal Lake Apartments Limited Partnership.
**Q. And Mr. Cox, have you ever met Dotti Danca?**
A. Yes.
**Q. And do you know her fairly well? I mean you dealt with her on a regular basis?**
A. On a business level.
**Q. And did you take part in her hiring?**
A. No, actually.
**Q. And do you know who did hire her?**
A. I believe it was the manager at the time, Carlson.
**Q. And was she subsequently hired by Equity Property Management?**

Page 10

A. Yes.
**Q. And did you have any involvement in the hiring of her as an employee from Equity Property Management?**
A. I guess indirectly.
**Q. And by indirectly, what do you mean?**
A. She was already the property manager and when we took over management -- actually, Habitat succeeded Carlson and I guess technically she had been retained by Habitat, and then when Equity Property Management was retained, she was retained by Equity Property Management.
**Q. And Mr. Cox, are you aware of allegations of racial discrimination made by Bridget Krieman, Darlene Krieman and Anthony Krieman while they resided at Crystal Lake Apartments?**
A. As a result of your lawsuit.
**Q. And is it only as a result of the lawsuit that you're aware of those allegations?**
A. I believe I was aware of some allegations they made with HUD preceding that.
**Q. So, when was the first time you became aware of allegations of racial discrimination made by the Kriemans at Crystal Lake Apartments?**

Page 11

A. I don't recall the exact date.
**Q. But it would be the HUD investigation?**
A. I don't recall.
MR. BUTLER: Can you mark this, please?
(Exhibit No. 1 was marked for identification.)
BY MR. BUTLER:
**Q. I'm handing you what's been marked as Exhibit No, 1. Can you please take a moment to review it?**
A. Do you want me to read this whole thing?
**Q. If you like or if you recognize it.**
A. I don't believe I have ever seen this.
MR. OAKES: Has this been produced by the plaintiffs?
MR. BUTLER: It was not produced, it was identified in your request for documents.
MR. OAKES: But not produced?
MR. BUTLER: You didn't ask for it. You asked for it to either be identified or produced.
THE WITENSS: If he asked for it to be identified or produced, doesn't that mean he wants you to produce it?

Page 12

MR. BUTLER: It says either identify or produced. I'm not here to argue the point.
MR. OAKES: And you're saying this was identified?
MR. BUTLER: Correct,
MR. OAKES: Are there any other documents that have been identified but not produced today other than Exhibit No. 1?
MR. BUTLER: It was documents that we received from the Habitat Company that we identified. We identified each individual document.
THE WITNESS: Can we get those produced?
MR. OAKES: Well, I'll go back and look at the discovery and follow-up on the identified documents.
I don't know if this document existed. I'm not certain I'm aware it was actually disclosed, but I'll have to find that out.
Do you want him to read the whole document?
MR. BUTLER: If he doesn't recognize it or if it was not received then I don't know.

Page 13

THE WITNESS: Well, I have never received this document.
MR. OAKES: By the way, Bridget Krieman testified that she never notified EPM of any of these allegations, so I think this is a very curious document that has been produced.
At the time of her deposition, it was never produced in response to discovery.
THE WITNESS: Do you think this plaintiff committed that kind of fraud?
MR. OAKES: I don't know.
BY MR. BUTLER:
**Q. So, you have no recollection of having received this document?**
A. Not a bit.
MR. BUTLER: Can you mark this, please?
(Exhibit No. 2 was marked for identification.)
BY MR. BUTLER:
**Q. I'm handing you what's been identified as Exhibit No. 2.**
MR. OAKES: Again, this is a document you received from Habitat?
MR. BUTLER: That's correct.

MR. OAKES: You subpoenaed Habitat's records?
MR. BUTLER: Yes.
THE WITNESS: Okay.
BY MR. BUTLER:
**Q. Do you recognize this document?**
A. I recognize it as a letter on my stationery.
**Q. And what do you recognize this document to be?**
A. It's a letter that says it was transmitting a letter from Bridget Krieman to Niall Byrne.
**Q. And do you recognize this letter --**
A. That's not my signature, no.
**Q. That's not your signature?**
A. No, it's not.
**Q. Is it your common practice to have letters go out with your letterhead not containing your signature?**
A. A transmittal of some sort could be done in a letter that has little substance. Just transmitting something my secretary would be authorized to transmit that, yes.



**Q. Do you know if that's your secretary's signature?**
A. That looks like her -- It doesn't look like what I would write.
**Q. Let me ask you this. Did you ever read this document?**
A. Which document?
**Q. Exhibits 2.**
A. I don't recall.
**Q. And do you know why this document was not produced pursuant to our discovery request?**
A. You'd have to ask my lawyer.
**Q. And this letter refers to a copy being forwarded of your response to Ms. Krieman to me.**
**Did you ever receive a copy of a response to Ms. Krieman from Niall Byrne of the Habitat Company?**
A. I don't recall.
**Q. So, Mr. Cox, were you aware in 1996, of allegations of racial discrimination made by the Kriemans at Crystal Lake Apartments?**
A. Again, I don't recall.
MR. BUTLER: Can you please mark this?



(Exhibit No. 3 was marked for identification.)
BY MR. BUTLER:
**Q. I'm handing you what's been marked as Exhibit No. 3. Please take a moment to review it.**
A. Okay.
**Q. Do you recognize this document?**
A. I have seen it in preparation for this deposition.
**Q. And did you see this document in 1996?**
A. I see a lot of documents. I don't recall seeing this in 1996, but I could have.
**Q. And it is a memo addressed to you; is that correct?**
A. Correct.
**Q. And it's from a Teri Williams?**
A. Yes.
**Q. And who is Teri Williams?**
A. My assistant.
**Q. And in the memo, in the third paragraph, it references, "Bridget has spoken with Niall and he has the same rude attitude. They have never had a problem here in 17 years. She has been**



**hearing comments made towards her son, (he is biracial). Friends and family have heard the comments also. She feels that they may be discriminated against."**
MR. OAKES: Are you asking the witness whether he sees that language?
MR. BUTLER: I'm going to ask a question based on that particular comment.
BY MR. BUTLER:
**Q. Is it your testimony that you knew of allegations of racial discrimination in July of 1996?**
MR. OAKES: Objection. You're asking this witness to make a legal conclusion as to whether a telephone conversation that he wasn't a party to did or did not constitute an allegation of racial discrimination.
I believe the question is improper in the form and ask for a legal conclusion. And I'll instruct the witness not to answer to the extent it calls for a legal conclusion.
BY MR. BUTLER:
**Q. Were you aware in July of 1996, that your secretary said that Bridget Krieman had said she**

Page 18

**feels that they may be discriminated against?**
A. I don't recall.
**Q. Do you recall if you took any action with respect to this memorandum?**
A. I don't recall. I don't recall seeing the memorandum at the time. This is 9 years ago.
**Q. And directing your attention to the 4th paragraph, it says, "She wonders if it's because of her son's color."**
**Do you recall having any discussion with anyone with respect to Bridget Krieman's son color in 1996?**
A. No, I do not.
**Q. Going back to Plaintiff's Deposition Exhibit 2, where would this sort of document normally be kept?**
A. I don't know. In a file for Crystal Lake.
**Q. And was it normal at the time in 1996, that letters from you would go out under Financial Equity Associates, Inc., letterhead?**
A. Normal for what purpose?
**Q. For the purposes of dealings with Crystal Lake Apartments.**

Page 19

A. Probably. I don't think EPM existed yet.
MR. BUTLER: Can you please mark that?
(Exhibit No. 4 was marked for identification.)
BY MR. BUTLER:
**Q. I'm handing you what's been identified as Exhibit No. 4, and please take a moment to review it, which you're already doing.**
A. Okay.
**Q. And have you had an opportunity to review this document?**
A. Yes.
**Q. Do you recognized this document?**
A. No, I don't recall it at all.
**Q. You have never seen this document before?**
A. I said I don't recall seeing it. I literally see thousands of documents every year.
**Q. Let me direct your attention to some things in the document. On the second page of the document, it says beginning with the second sentence, "As far as they know, Anthony is the only black person at Crystal Lake Apartments. Bridget and Darlene have heard Ms. Danca and the maintenance man at the complex make vulgar,**

Page 20

**demeaning jokes about black people. They've heard the word "nigger," used by Danca. In addition, Bridget heard her make a negative reference to Anthony Krieman's race. It's entirely likely that racial discrimination is a motive behind Ms. Danca's actions."**
**Do you recall ever reading that before?**
A. No, I don't.
**Q. Would you have considered allegations such at those made in this letter to be serious?**
A. If they were true, yes, if they were true. I also don't believe that they were the only black people in Crystal Lake Apartments.
I make many trips out there and we have many minorities of blacks and Hispanics.
**Q. Did you ever undertake any investigation or any steps to determine whether the word "nigger" was ever used at Crystal Lake Apartments by Dotti Danca?**
A. I don't recall ever seeing this letter, so I don't see how I would remember doing an investigation.
**Q. Just in general did you ever make any**

Page 21

**investigation with respect to Dotti Danca making racial comments at Crystal Lake Apartments?**
A. Dotti was the manager at that property for 10 years or something like that. Never any other complaints from anybody else to my knowledge.
**Q. But to your knowledge, these complaints were made?**
A. No, I'm not saying that. I don't recall this letter being received.
**Q. You said that you're sure there is no -- no one else made allegations similar to the allegations here; is that correct, the allegations contained in this document?**
A. I'm saying that the years that Dotti was a manager there, I don't recall any other complaints about her using that word, and a point of fact in reviewing her deposition for this, she denies ever using that word.
I've known Dotti for a lot of years and I don't believe that she would use that. I wouldn't stand for it that's for sure.
**Q. Do you recall any allegations from 1996, of the Kriemans making allegations that Dotti**

**Danca was using racial language?**
A. Not until the HUD complaint or whatever was filed, and I'm sure I asked Dotti about that at the time and she denied ever using that terminology.
**Q. Well, did you ask her at the time if she used that terminology?**
A. Which time?
**Q. Did you ask her in 1996?**
A. I said I don't recall this whole exchange here. I'm sure if I had received this, but I don't remember if I had received this.
If I had, I certainly would have asked her about this and about this problem.
MR. OAKES: Wait. For the record, Exhibit No. 4 is not addressed to Mr. Cox.
MR. BUTLER: I understand that.
THE WITNESS: Nor was I directly involved with management at the time.
MR. BUTLER: Can you please mark this.
(Exhibit No. 5 was marked for identification.)



BY MR. BUTLER:
**Q. Mr. Cox, I'm handing you what's identified as Plaintiff's Exhibit No. 5, and please take a moment to review it.**
A. Can I have a moment with my attorney?
**Q. Certainly.**
**(Discussion held off the record.)**
MR. BUTLER: Back on the record.
BY MR. BUTLER:
**Q. Mr. Cox, do you recognize Exhibit No. 5?**
A. No.
**Q. Have you never seen it or you don't recall having seen it?**
A. I don't recall seeing it, but I would remember it if someone was threatening major litigation. I did not see this letter.
MR. BUTLER: Can you please mark this?
(Exhibit No. 6 was marked for identification.)
BY MR. BUTLER:
**Q. Mr. Cox, I'm handing you what's been identified as Exhibit 6. Please take a moment to review it.**



A. Okay.
**Q. And do you recognize this document?**
A. I don't recall seeing this either.
**Q. Do you recall in June of 2001, there being allegations that Dotti Danca is a racist?**
A. As I've said before, the earliest indication that I recall that there was a complaint against Dotti on this property regarding this, the Kriemans, was the HUD complaint that was being investigated.
My firm was not the manager of this property in 1996, that was Habitat.
**Q. Was your firm the manager of the property in 2001?**
A. Yes, it was.
**Q. And this document purports to be from 2001?**
A. I understand that.
MR. BUTLER: Can you please mark this?
(Exhibit No. 7 was marked for identification.)
BY MR. BUTLER:
**Q. I'm handing you what's been identified as Exhibit No. 7.**



**Do you recognize this document?**
A. I have seen it in preparation for this deposition.
**Q. Did you ever see it in 2001?**
A. I don't recall seeing this in 2001.
**Q. Do you recall any allegations that Dotti Danca, any allegations coming to your attention in 2001, that Dotti Danca had referred to Tony Krieman as that little biracial bastard?**
A. I may have had a conversation with Kevin Morse about this in connection with that HUD investigation, that's all I remember.
**Q. And did you have a conversation with Kevin Morse with respect to those allegations?**
A. I believe I had some conversations with him again around the time of the HUD investigation. I don't remember the exact timetable here.
**Q. And on how many occasions did you have a conversation with Kevin Morse?**
A. I don't recall.
**Q. And what did you and Kevin Morse discuss in those conversations?**
A. I think I discussed with him whether he

was investigating this in determining if these were legitimate complaints.
**Q. And what did he tell you?**
A. I don't recall. I think he said that they were not legitimate, that he talked to the people who did these affidavits.
**Q. Did he say he spoke to both people?**
A. Yes, and he spoke with Dotti.
**Q. Do you know if he ever spoke to Darlene Kriemans?**
A. I don't recall if he said that or not.
**Q. Do you know if you ever spoke to Anthony Krieman?**
A. I don't recall.
**Q. Do you know if he ever spoke to Bridget Krieman?**
A. I don't recall.
**Q. Did you ever take it upon yourself to speak with Brendan Holloran with respect to the allegations made in this affidavit?**
A. I delegated any of this investigation to Kevin who I entrusted would do a good job with it.
**Q. And the form of your delegating the investigation to Kevin Morse was just an oral?**



A. It most likely would have been oral. I don't recall if I did anything in writing.
**Q. What was the results of his investigation?**
A. Well, considering that I kept -- if I felt for a moment that Ms. Danca had said those things or was engaged in discrimination, I would have fired her on the spot.
So, I presumed by the fact that she was still there, that he had concluded that those were unfounded allegations.
**Q. So, it would have been your feeling that those allegations were unfounded?**
A. Well, I do remember having a conversation with Dotti maybe around that time in which she had related to me problems that she had been having with these tenants regarding paying their rent, a dog, and verbal abuse by them on the phone.
That I do recall. I don't know exactly when those conversations with Dotti took place. I suspect they were around the time of the HUD complaint.
**Q. And with respect to Kevin Morse's investigation, what were the results of the**



**investigation?**
A. Again, I presume by the fact that she was still working there -- I grew up in a housing complex on the south side of Chicago in an integrated place.
My mother was a librarian at Calumet High School, which was completely a hundred percent black. I grew up tutoring black children.
My mother ingrained in me the idea of none discrimination. If I felt for a moment that one of my employees discriminated, they would be terminated on the spot.
So, I presumed by the fact that she was still there, that Kevin determined that these were allegations of little merit, not to mention the fact that there were absolutely no other allegations made against Dotti by any other party.
With the hundreds and hundreds of tenants who have been through that complex, no one else had made any kinds of even remote kinds of allegations as this.
MR. BUTLER: Can you mark this?
(Exhibit No. 8 was marked for identification.)



BY MR. BUTLER:
**Q. Mr. Cox, I'm handing you what's been identified as Exhibit 8.**
**Please take a moment to review it?**
A. I've seen it before.
**Q. And do you know when you saw this document?**
A. In preparation for this deposition.
**Q. Was that the first time you saw this document?**
A. I don't recall seeing it prior to that date.
**Q. And what is your -- let me ask you about the specific allegations contained in here.**
**Specifically, Paragraph 4, half the way down. "I also wanted to find out whether we could get a refund if Dotti Danca was going to proceed with an eviction anyway.**
**Dotti Danca told me it's too late, the proceedings are going. She told me that the Kriemans did not want to go out and work, and they had been offered a job in the Township and had not taken it.**
**Then she said they don't work and**

**she has this biracial boy running around. Danca repeated the statement she had this biracial boy several times during our conversation."**
**Do you ever recall reading that in 2001?**
A. No.
**Q. Would you characterize those as serious allegations?**
A. If they were true and if somehow Dotti were discriminating, I would consider them serious and I would take action, neither of which I believe was true.
**Q. What sort of action would you take to determine whether it was true?**
A. I'm sure I would have asked Kevin to investigate, to talk to these people, and to talk to Dotti and investigate the situation.
**Q. But Kevin actually never reported back to you with his results to his investigation; is that correct?**
A. That's your words. I said I don't recall that conversation. I do, however, know that Dotti in her deposition, and again I've known Dotti for 10 years and I believe her, she said she



may have used the term biracial in the context of this conversation in asking him why he wasn't helping somebody who had a hand in injury and was he helping this person because they had a biracial boy.
I don't think that reflects discrimination one iota.
MR. BUTLER: Can you please mark this?
(Exhibit No. 9 was marked for identification.)
BY MR. BUTLER:
**Q. I'm handing you what's been identified as Exhibit No. 9. Please take a moment to review it.**
A. Okay.
**Q. Have you had a moment to review it?**
A. Yes.
**Q. And do you recognize this document?**
A. I don't believe I have ever seen it before.
**Q. Let me just take a moment and I think I can streamline what I have left if that's okay?**
A. Sure.
**Q. And directing your attention back to**



**Exhibit No. 1, you said I recall already something about there being fraud.**
**Do you recall saying that?**
A. No.
**Q. Do you believe this letter to be fraudulent?**
A. No, I don't know.
**Q. Do you believe anything the Kriemans have done in this case to be fraudulent?**
A. That's a good question. I don't know. I don't believe they're telling the truth about their relationship with Dotti.
I think these two people didn't like each other and they were abusive to Dotti and they didn't pay their rent on time and Dotti didn't like them for that reason.
And yes, I believe they decided that they were going to use the racial makeup of their son to try to make trouble for Dotti.
**Q. And you consider that to be fraud?**
A. Yes.
**Q. Do you consider anything else that they have done to be fraudulent?**
A. Besides not paying their rent on time,



besides not telling the Housing Authority about income, besides using credit cards in violation of the law and all the other things that they've done, I don't know.
**Q. And Mr. Cox, have you ever been accused of fraud?**
A. In what context?
**Q. In any context.**
MR. OAKES: I'm going to object to the relevance of your question. You can answer over the objection.
THE WITNESS: I've had complaints in litigation that were dismissed.
BY MR. BUTLER:
**Q. And what litigation would that be?**
MR. OAKES: Objection, relevance. You can answer.
THE WITNESS: There was a complaint made by some investors in one of my deals.
BY MR. BUTLER:
**Q. And what deal was that?**
A. I don't recall.
**Q. Do you know who the investors were?**
MR. OAKES: Objection. Relevance.

THE WITNESS: It's in a public record.
BY MR. BUTLER:
**Q. But do you know who the investors were?**
A. Yes.
**Q. And who were the investors?**
MR. OAKES: Same objection as to relevance.
THE WITENSS: Do I need to spell all of this out?
MR. OAKES: You can answer over my objection.
Can you explain why this is germane to the litigation?
MR. BUTLER: It's obviously germane to the issue of fraud.
THE WITNESS: What issue of fraud?
MR. BUTLER: You brought up fraud with respect to my client, so I was just asking you about fraud with respect to your client.
MR. OAKES: No, I think you asked him whether he had an opinion as to whether the plaintiffs had committed any fraud in relationship to their tenancy at Crystal Lake Apartments.
THE WITNESS: Well, there are other



people who have abused the legal process like your clients are.
MR. OAKES: I think it's wholly irrelevant to this situation.
THE WITNESS: And the answer is I've never been responsible for any fraud.
People have made those allegations and bogus complaints because they want to be bought out of certain deals and they abused the legal process as you're doing to accomplish that end.
BY MR. BUTLER:
**Q. So, you believe that I personally am abusing the legal process?**
A. Absolutely.
**Q. And what would form the basis of that opinion?**
A. Because you're representing people who are admitted fraud feasors in making a complaint.
They admitted. They were found guilty.
**Q. And who found them guilty?**
A. They admitted it in discussions with Housing Authority and I think Bridget, hasn't she



pled guilty to a misdemeanor charge with a credit card or something like that?
MR. OAKES: I believe that is correct and of public record.
THE WITNESS: Dotti Danca to my knowledge has never been accused or found guilty of any fraud.
BY MR. BUTLER:
**Q. So, assuming someone commits credit card fraud, does that mean they can't be discriminated against on the basis of their race?**
A. No, not at all. I do not count this as a discrimination in any form whatsoever no matter what they do, but it does have a bearing on whether they're making a truthful allegation or not.
MR. OAKES: And I believe the rules of evidence --
THE WITNESS: It also has a morale bearing of whether you should be using the resources of this Fair Housing Clinic to mount a totally bogus and fraudulent attack based upon the word of people who have admitted the kinds of crimes that these people have.



BY MR. BUTLER:
**Q. So, now are you accusing me of fraud or the John Marshall Fair Housing Clinic of fraud?**
A. No, I would say you're misusing your resources, and believe me that will come out.
**Q. And how will that come out?**
A. We'll figure that one out when the time comes.
**Q. So, you think there is no base whatsoever for the case that we've brought here?**
A. I think you've got a couple of people here who like to abuse the system. I think that they didn't like Dotti Danca and they have a problem with her, and I think that she didn't like them because of the issues they have and the verbal abuse.
**Q. Let me direct your attention back to the affidavit of David Warren, which I believe is Exhibits No. 8.**
A. Okay.
**Q. Have you ever spoken with David Warren?**
A. No.
**Q. Do you know anyone who has ever spoken with David Warren?**

A. I believe Kevin did.
**Q. And do you know if the statements contained in his affidavit are true or not?**
A. I don't know if they're true or not.
I don't think that they demonstrate that there is discrimination. The fact that she says that she asked him or she mentioned that she has a biracial boy could have come up several times in a conversation in a very, very, innocuous way.
They could have been discussing who knows what. I sincerely doubt that Dotti Danca said that and said oh, gosh, Mr. Warren, I'm discriminating against them because they have a biracial boy.
**Q. Do you sincerely doubt the statements contained by David Warren in the affidavit?**
A. No, I don't have any reason to doubt that this gentleman had a conversation and meant well and brought over a check, and I have no doubt that maybe she referred, and she admitted that she referred to a statement about a biracial boy, and I accept the context.
Again, this is the only tenant out



of hundreds and hundreds of tenants who would have been through this complex who has ever made an allegation of this sort.
That to me merits the benefit of the doubt. I don't know about you, but that merits the benefit of the doubt to me.
**Q. How do you know that no similar allegations have been made by anyone?**
A. Because you're available to sue me based upon that.
Have you been contacted by any other people of this complex? No, you haven't been, and the HUD investigator interviewed all these people and decided that there was no merit to this thing.
Not only that, all of sudden it becomes an issue when she gets kicked out of the Housing Authority.
If these were such bad things, why didn't she bring a lawsuit in 1996? It only become an issue when she needed money to pay off the Housing Authority because she was in debt to them because she had defrauded them.
**Q. And how do you know that?**
MR. OAKES: Well, there are documents



in this case that support that.
THE WITNESS: Absolutely.
MR. BUTLER: It's not your testimony.
THE WITNESS: There are documents in this case that support that.
BY MR. BUTLER:
**Q. And what documents are those?**
A. I don't know. I've seen some documents.
MR. BUTLER: No further questions.
MR. OAKES: I've got no questions. We'll reserve signature and we'll request a copy of the deposition.
(FURTHER DEPONENT SAYETH NOT.)
* * * *



STATE OF ILLINOIS )
) SS:
COUNTY OF COOK )

I hereby certify that I have read the foregoing transcript of my deposition given at the time and place aforesaid, consisting of pages 1 through 43 inclusive, and I do again subscribe and make oath that the same is a true, correct and complete transcript of my deposition given as aforesaid, with corrections, if any, appearing on the attached correction sheet(s).

_______________ Correction sheet(s) attached.

______________________________
JOHN COX

Subscribed and sworn to
before me this ____ day of
_______________, A.D., 2005.
______________________________
NOTARY PUBLIC

STATE OF ILLINOIS )
) SS.
COUNTY OF COOK )

I, LATIFAH RAHIM, a Certified Shorthand Reporter within and for the State of Illinois, do certify that heretofore on, to-wit, October 26, 2005, personally appeared before me at 28 East Jackson Street, JOHN COX, produced as a witness for discovery examination in said cause.

I further certify that the said witness, JOHN COX, was by me first duly sworn to testify the truth, the whole truth and nothing but the truth in the cause aforesaid before the taking of the deposition; that the testimony was reduced to writing in the presence of said witness by means of machine shorthand and afterwards transcribed into typewriting, and that the foregoing is a true and correct transcript of the testimony given by said witness.

I further certify that there were present at the taking of the deposition the previously-listed individuals.

I further certify that I am not counsel for nor in any way related to any of the



parties to this suit, nor am I in any way interested in the outcome thereof.

I further certify that my certificate annexed hereto applies to the original and typewritten copies only, signed and certified transcripts only. I assume no responsibility for the accuracy of any reproduced copies not made under my control or direction.

In testimony whereof, I have set my hand this 11th day of November, 2005.

______________________________

Latifah Rahim - CSR NO. 084-003908