IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BRIDGET KRIEMAN, ANTHONY KRIEMAN, and DARLENE KRIEMAN, | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 05 C 0348 |
| v. | ) ) | Judge Virginia M. Kendall |
| CRYSTAL LAKE APARTMENTS LIMITED PARTNERSHIP, CRYSTAL LAKE INVESTMENTS LIMITED PARTNERSHIP, EQUITY PROPERTY MANAGEMENT, L.L.C., and DOTTI DANCA, | ) ) ) ) ) ) | |
| Defendants. | ) | |

MEMORANDUM OPINION AND ORDER

Bridget Krieman ("Bridget"), Bridget's son Anthony Krieman ("Anthony"), and Bridget's mother Darlene Krieman ("Darlene") (collectively "Plaintiffs" or "Kriemans") filed suit against Crystal Lake Apartments Limited Partnership, Crystal Lake Investments Limited Partnership, Equity Property Management, LLC and Dotti Danca ("Danca")(collectively "Defendants") for violations of the Federal Housing Act ("FHA"), 42 U.S.C. § 3601 *et seq*. Defendants are the owners of the apartment complex where the Krieman family lived, the managing company of the apartment complex, and the manager respectively. Plaintiffs sued Defendant Danca individually, and sued the other Defendants under a theory of vicarious liability. Plaintiffs allege that Danca discriminated against Plaintiffs on the basis of race and retaliated against them when they complained about the discrimination. Defendants have moved for summary judgment on all counts of Plaintiffs' complaint. Because Plaintiffs cannot establish the required *prima facie* case under the elements of each alleged claim, Defendants' motion for summary judgment is granted.

<u>Factual Background</u>

For purposes of summary judgment, all disputed facts are viewed in the light most favorable to non-movant Plaintiffs and all reasonable inferences are drawn in their favor. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001). Plaintiffs resided together for more than 20 years in an apartment in a complex owned by Defendants Crystal Lake Apartments Partnerships and managed by Defendant Equity Property Management ("EPM"). Def. Am. Statement of Mat. Facts at ¶¶ 1-4 (hereafter "Def. 56.1 at ___").[1] Plaintiff Anthony Krieman, son of Bridget Krieman, lived in the apartment from birth until the family was evicted in 2003. *Id.* at ¶ 1. Bridget and Darlene are Caucasian; Anthony is mixed Caucasian and African-American. *Id.* at ¶¶ 1-3. Darlene Krieman received a Section VIII housing subsidy from McHenry County, Illinois that paid a portion of the monthly rent for the apartment. Darlene Krieman Dep. at 18-19.

Defendant Danca served as the property manager of the complex starting in 1995, and was still the complex manager at the time of Plaintiff's eviction in 2003. Def. 56.1 at ¶ 7. In 1995 and 1996, Danca's property management office was located directly below the Krieman's apartment. Plaintiffs' L.R. 56.1(b)(3)(B) Statement of Additional Facts at ¶ 6 (hereafter "Pl. 56.1 at ¶ ___"). During that time, the Kriemans heard Defendant Danca make numerous derogatory comments about Anthony's race, including calling him "nigger" and "biracial boy." Darlene Krieman Dep. at 31-45; Bridget Krieman Dep. at 48-61; Anthony Krieman Dep. at 14-26. In 1996, Bridget Krieman

---

[1]The Court cites to the Local Rule 56.1 statement submitted by each party only when the opposing party has specifically indicated in writing that they do not dispute the statement. Where the Rule 56.1 statements are incomplete or disputed, direct cites from the record support the factual findings.

confronted Danca about the statements, after which time Bridget heard no further comments. Bridget Krieman Dep. at 60-61, 64-65.

Also in 1996, Danca sent Darlene Krieman a letter that her lease would not be renewed for the following yearly term. Pl. 56.1 at ¶ 17. Prairie State Legal Services group to advocate on Plaintiffs' behalf with respect to the non-renewal. Pl. 56.1 at ¶ 27. In September 1996, Niall Byrne, an employee of EPM, sent a letter to Plaintiffs' counsel that the lease would be renewed. Pl. 56.1 at ¶ 35.

In December 2000, Plaintiffs did not make a rent payment of $525.35. Def. 56.1 at ¶ 29. Danca gave Plaintiffs notice of late payment on the 5th of the month, stating that they had five days in which to pay the balance of rent due before eviction would commence. Danca Aff. at ¶ 16, Ex. 4. On December 11, the rent had not been paid, and Danca forwarded documents to legal counsel for EPM to commence an eviction action. Danca Aff. at ¶ 17. On December 13, 2000, the St. Thomas Apostle church sent two checks, each in the amount of $265, for a total of $530, to cover the delinquent rent for the Kriemans. Def. 56.1 at ¶ 34; Danca Aff. at Ex. 5. Danca accepted and deposited the checks, which did not cover the entire amount due, because late fees and eviction action costs had increased the amount owed. Danca Aff. at ¶¶ 18-20. The eviction action continued.

David Warren, a member of the St. Thomas Apostle Church, visited Danca in January 2001 to ask about the process of the eviction and whether EPM would refund the checks to the church. Warren Aff. at ¶ 4. Danca told him that it was too late, and that "[the Kriemans] don't work and she has this biracial boy running around." Warren Aff. at ¶ 4. Warren testified that Danca used the term "biracial boy" several times during the conversation. Warren Aff. at ¶ 4. In February 2001, EPM

and the Kriemans settled the eviction action and the Kriemans remained in the apartment. Def. 56.1 at ¶ 42; Pl. 56.1 at ¶ 40.

In August 2001, McHenry County terminated Darlene Krieman's Section VIII housing subsidy. Def. 56.1 at ¶ 50. As a result of the termination, the Krieman's monthly rental payment increased to $975. Def. 56.1 at ¶ 50. Danca sent the Kriemans a letter indicating that because the housing assistance had terminated, the rent would increase and a credit check would be required at a cost of $30 per applicant. Pl. 56.1 at ¶ 43. If the credit check were not completed, Plaintiffs would be evicted. Pl. 56.1 at ¶ 43. There is no standard procedure at the Crystal Lake apartment complex for conducting credit checks on current tenants. Pl. 56.1 at ¶ 44. At the time Danca sent the letter requiring the credit check, Plaintiffs had already renewed their lease for the following year. Bridget Krieman Dep. at 78-79. After another inquiry by Plaintiffs' counsel, counsel for EPM indicated that a credit check would not be required, and to disregard Danca's letter. Pl. 56.1 at ¶ 46-47.

In the summer of 2002, the Kriemans had problems with the maintenance of their apartment. During 2002, Jaime DeAlba was the maintenance person at the Crystal Lake apartment complex. DeAlba Aff. at ¶ 2. DeAlba would receive work orders from Danca, unless the request was an emergency. Def. 56.1 at ¶ 58, DeAlba Aff. at ¶ 5. DeAlba carried a pager, and would respond to requests the same day that they were forwarded to him by Danca. Def. 56.1 at ¶ 58, DeAlba Aff. at ¶ 5. DeAlba followed the same procedure with all tenants, including the Kriemans. Def. 56.1 at ¶ 59, DeAlba Aff. at ¶ 5. The Kriemans were aware of a verbal requirement that maintenance requests be put in writing. Darlene Krieman Dep. at 50; Bridget Krieman Dep. at 82-83.

The Kriemans experienced problems with a the water heater, the air conditioner, and the telephone connection. Both Bridget and Darlene Krieman communicated with Danca about the

water heater. Pl. 56.1 at ¶ 60. The water heater took approximately 4 days to be repaired. Darlene Krieman Dep. at 60-61. During that period, no other tenants received new water heaters. Def. 56.1 at ¶ 67. The phone line took approximately 3 weeks to be repaired; the phone stopped working on April 17, Bridget Krieman left a telephone message via cell phone with Darlene on April 22, and submitted the request in writing on April 27. Pl. 56.1 at ¶ 52, 55; Danca Aff. at Ex. 6. Danca responded to Bridget's letter on May 8 with confirmation that the apartment complex would pay for the repairs, and the repairs were completed on May 9. Danca Aff. at Ex. 6-7, Def. 56.1 at ¶ 83; Bridget Aff. at 85-92. During that period, Danca's supervisor, Kevin Morse, reviewed the matter and determined that the telephone problem was the responsibility of the apartment complex and not the responsibility of the tenant. Def. 56.1 at ¶ 81, Morse Aff. at ¶ 31. The air conditioner did not work properly throughout the summer of 2002. Darlene Krieman Dep. at 67. The Kriemans did not put their concerns about the air conditioner in a written maintenance request. *Id.*

In March 2003, Plaintiffs did not pay the rent. Bridget Krieman Dep. at 21; Darlene Krieman Dep. at 13. In an eviction action brought by the apartment complex, Bridget and Darlene Krieman signed an agreed order in April 2003 terminating the lease and ordering judgment against Bridget and Darlene Krieman for the unpaid rent. Bridget Krieman Dep. at 26-27; Morse Aff. at Ex. 13. At least one Plaintiff does not dispute that Defendants have the legal right to offset the judgment with the security deposit. Bridget Krieman Dep. at 26-27.

In the fall of 2002, Plaintiffs filed a complaint against Defendants with the Department of Housing and Urban Development concerning discrimination in housing. Pl. 56.1 at ¶ 86. Plaintiff withdrew the complaint on September 30, 2004. Pl. 56.1 at ¶ 87. Plaintiffs filed this action in January 2005.

<u>Discussion</u>

*Legal Standard*

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56.(c). In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court, however, will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chicago Sch. Reform Bd. Of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000). Plaintiff retains the burden of producing enough evidence to support a reasonable jury verdict in her favor. *East-Miller v. Lake County Highway Dept.*, 421 F.3d 558, 561 (7th Cir. 2005). "The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 562, *quoting Anderson*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

Where a proposed statement of fact is supported by the record and not adequately rebutted, the court will accept that statement as true for purposes of summary judgment. An adequate rebuttal requires a citation to specific support in the record, an unsubstantiated denial is not adequate. *See Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("Rule 56 demands something more specific than the bald

assertion of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.").

*Statute of Limitations*

For each of Plaintiffs' five claims of housing discrimination, Plaintiffs rely upon events that occurred between 1995 and 2003. Private actions under the FHA have a statue of limitations of 2 years. 42 U.S.C. 3613(a)(1)(A). Defendants argue that the only event that occurred within the statute of limitations, the 2003 eviction, has been admitted by Plaintiffs to be an eviction for failure to pay rent. Therefore, Defendants argue that summary judgment must be granted in their favor on all counts because the remaining events occurred outside the statute of limitations.

Plaintiffs respond in two parts to the allegation that the events of 1995-2002 are time-barred. For the acts during and after December 2000, Plaintiffs present the undisputed evidence that Plaintiff filed a complaint with the Department of Housing and Urban Development ("HUD") in August 2002, which complaint continued through September 2004. Pl. 56.1 at ¶¶ 86-87. A pending administrative proceeding tolls the statute of limitations for housing discrimination claims. 42 U.S.C. § 3613(a)(1)(B). Plaintiffs argue that the 2000-2002 claims remain actionable due to the toll. Plaintiffs also argue that, once the 2000-2002 claims are actionable, the statements and events in 1995 and 1996 are also actionable because they are part of a "continuing violation" or discriminatory pattern. *See Wallace v. Chicago Housing Authority*, 321 F. Supp. 2d 968, 972-73 (N.D. Ill. 2004).

Because Defendants do not dispute that Plaintiffs filed a HUD complaint in August 2002 that remained pending until September 2004, the alleged events of December 2000 and later do not fall outside the statute of limitations and are within the proper scope of the complaint. The events and statements from 1995 and 1996, however, considerably predate the events of 2000-2002.

Plaintiffs cite to the *Wallace* decision from this district in support of the application of the "continuing violation" theory of housing discrimination. The court in *Wallace* concluded that the phrase "2 years after the occurrence *or termination* of an alleged discriminatory housing practice" specifically affirmed Congressional intent to a"allow parties to recover for earlier acts under the FHA that constitute part of an on-going pattern or practice." *Id.* That amendment, coupled with the Supreme Court's holding in *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 381 n.23 (1982), allows a plaintiff to include acts outside the statute of limitations in a claim for housing discrimination when the acts are part of an alleged pattern of conduct. *Wallace,* 321 F. Supp. 2d at 973.

To establish a continuing course of conduct under any tort claim, including housing discrimination, the plaintiff must show that the character of the earlier actions "was not apparent when they were committed but became so when viewed in light of the later acts." *Id., quoting Moskowitz v. Trustees of Purdue University*, 5 F.3d 279, 282 (7th Cir. 1993). Therefore, to establish a "continuing violation" theory from 1995-96 to 2000-2002, Plaintiffs must establish that Plaintiffs did not realize that the 1995-96 actions were acts of discrimination until the events of 2000-2002 made that discrimination evident. *Id.* at 973. For example, the *Wallace* plaintiffs alleged a pattern of segregation in public housing, by alleging a collection of incidents over a 10-year period that when viewed collectively indicated a pattern of racial steering that affected a class of residents. *Id.* In the case before the Court, by contrast, the record submitted by Plaintiffs shows that Plaintiffs knew they had a potential discrimination in 1996, because Plaintiffs' counsel sent a letter to Defendants in 1996 raising the issue of discrimination as a factor in the 1996 attempted eviction. *See* Pl. 56.1 at ¶ 27. Therefore, no reasonable jury could find that the character of Defendants' 1996 actions was not apparent to Plaintiffs until the later actions in 2000-2002.

Because Plaintiffs cannot show that they were unaware of the potentially discriminatory nature of Danca's 1996 refusal to renew the lease, the 1996 action falls outside the 2 year statute of limitations of the FHA and will not be considered as part of this case.

*The Claims*

A.  42 U.S.C. § 3604(a)

Plaintiff allege in Count I of the Complaint that the Defendants violated the provisions of 42 U.S.C. § 3604(a).  Section 3604(a) states that it is unlawful:

> (a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin.

42 U.S.C. § 3604(a).  Claims brought under § 3604(a) must be claims that discrimination occurred during the rental or sale of property.  *Halprin v. Prairie Single Family Homes of Dearborn Park Ass'n*, 388 F. 3d 327, 328 (7th Cir. 2004) (holding that plaintiffs who already acquired property could not sue under § 3604 for interference with enjoyment); *see also Flores v. Bensenville*, 2003 WL 1607795 (N.D. Ill. 2003) (holding that in order to survive summary judgment on §3604(a) there must be a denial of a dwelling as a result of some action by defendants); *Southend Neighborhood Improvement Ass'n v. County of St. Clair*, 743 F.2d 1207, 1209-10 (7th Cir. 1984) (claim for post-purchase discrimination not valid under section 3604(a) because "the alleged illegal actions must lead to discriminatory effects on the availability of housing").

In *Halprin*, the Seventh Circuit discussed the application of § 3604 as a whole to discrimination claims based in interference with enjoyment rather than access to housing.[2]  The court

---

[2]Plaintiffs argue that *Halprin* does not apply to this case, because it involved "post-sale" discrimination by a homeowners' association.  That factual difference is not enough to distinguish Plaintiffs' case from the strongly similar legal issues raised by *Halprin*.  Plaintiffs

concluded that the Congressional basis for establishing the FHA stemmed from "concern with activities, such as redlining, that prevent people from acquiring property." *Id.* at 328. The court addressed the possibility that an eviction, or even an attempted eviction, on the basis of discriminatory motive could constructively equal denial of access to a home, but the court found no specific holding in case precedent to support such an interpretation. *Id.* at 328. Based on Congressional intent in enacting the FHA, the Court concluded that § 3604 could not be applied to claims of post-purchase discrimination in enjoyment of property. *Id.*

Like the plaintiffs in *Halprin*, Plaintiffs do not allege that Defendants denied them access to housing. While Plaintiffs claim that Danca *tried* to evict them on several occasions with discriminatory motive - through the credit check imposed after Darlene Krieman lost her housing assistance, and through failure to halt the 2001 eviction action when St. Thomas church paid a portion of the rent - Plaintiffs do not allege that the eviction attempts ever succeeded. *See* Darlene Krieman Dep. at 79. Defendants repeatedly renewed Plaintiffs' lease throughout the 2000-2003 period, and Plaintiffs lived in the apartment the entire period.

The only potential denial of access to housing is the eviction in 2003. To show a *prima facie* claim of discrimination under § 3604(a), a plaintiff must be able to show that: 1) plaintiffs are members of a protected class; 2) defendants were aware of their class membership; 3) plaintiffs were ready, willing, and able to buy, rent, or otherwise inhabit a dwelling; and 4) defendants refused to allow them to do so. *Hamilton v. Svatik*, 779 F.2d 383, 387 (7th Cir. 1985). In March 2003,

---

may not have owned the apartment, but they had rented the same apartment in the complex for more than 20 years, making their claims one of "post-lease" discrimination. And while the *Halprin* plaintiffs alleged discrimination by a homeowners' association, the position of power held by an association in relation to the owners bears strong similarity to the power wielded by a rental housing manager over a renter.

Darlene Krieman signed an order in a 2003 McHenry County eviction action on which order Bridget's name is printed but not signed, agreeing that Plaintiffs could have until April 1 and April 5 to make two payments of the unpaid rent and late charges. *See* Morse Aff. Ex. 12. In April 2003, Plaintiffs signed another order agreeing to eviction for nonpayment, in which Plaintiffs agreed to vacate the premises immediately and in which judgment was entered against them for unpaid rent. *See* Morse Aff. Ex. 13. Plaintiffs make a claim that the ongoing pattern of discrimination exhausted their will to remain in their home and was "one of the reasons" Plaintiffs entered the agreed orders (Bridget Krieman Aff. at ¶ 17), but do not dispute that both Darlene and Bridget Krieman were present at the eviction hearings and signed the April 2003 eviction order and judgment. Bridget Krieman Dep. at 23-24; Darlene Krieman Dep. at 16-17. Plaintiffs also do not dispute that they had failed to pay the rent in 2003, when they were evicted. Bridget Krieman Dep. at 21, 26-27; Darlene Krieman Dep. at 13-15. Therefore, Plaintiffs cannot state a *prima facie* claim that they were willing and able to rent the dwelling in 2003 when they were evicted, the only action in the complaint that would constitute an actual denial of housing.

### B.  42 U.S.C. § 3604(b)

In Count II of the Complaint, Plaintiffs argue that the events of 2002 concerning the maintenance of their property are denials of services in violation of § 3604(b). Section 3604(b) makes it unlawful:

> (b) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin.

42 U.S.C. § 3604(b). Initially, it is arguable that the Seventh Circuit in *Halprin* intended to preclude *all* § 3604 claims that do not involve a denial of housing access, including services claims under §

3604(b). *See Halprin*, 388 F.3d at 328-29 (summarily concluding that post-purchase plaintiffs "have no claim under section 3604" after mentioning § 3604(b)); *see also Southend*, 743 F.2d at 1210 (limiting denial of services claim against a governmental entity to denial of functions such as police protection or garbage collection). However, because the holding of *Halprin* addressed general "interference with enjoyment" rather than denial of specific services, and because *Southend* concerned only governmental services, the Court will not presume that the Seventh Circuit intended to categorically preclude all denial of service claims under § 3604(b). Drawing all inferences in the light most favorable to Plaintiffs, the delay in maintenance services could be viewed as a denial of access to the services to which they were entitled under the terms of the lease.

To establish a *prima facie* denial of services claim under § 3604(b), Plaintiffs must show: 1) that they are members of a protected class; 2) that they were qualified to receive the services in question; 3) that they were denied or delayed services by the Defendants; and 4) that Defendants treated a similarly situated person outside of the protected class more favorably. *Flores v. Village of Bensenville*, 2003 WL 1607795, *4 (N.D. Ill. 2003). The provisions of the FHA have been interpreted as functionally equivalent to Title VII provisions, and the two statutes "should be given like construction and application." *Kyles v. J.K. Guardian Sec. Servs., Inc.*, 222 F.3d 289, 295 (7th Cir. 2000).

Viewing the facts in the light most favorable to Plaintiffs, Plaintiffs present sufficient evidence to survive summary judgment on the first three elements of the *prima facie* test for the denial or delay of services. Plaintiffs are members of a protected class who were qualified in 2002 to receive maintenance services. While a jury might disagree that the facts demonstrate that Defendants were responsible for the delay in services (or even that the facts show a delay), Plaintiffs

have provided specific facts as to the number of days the repairs required and their repeated calls and written requests for repair.

But even viewing all the facts in Plaintiffs' favor, Plaintiffs have not provided supported evidence that other members of the apartment complex were treated differently. Plaintiffs agreed that no other tenants received new water heaters during the time that their water heater remained broken. Def. 56.1 at ¶ 67. Plaintiffs claim that the air conditioners of other tenants were repaired before their own, but could not identify those persons or provide any support for their position. The maintenance employee, Jaime DeAlba, testified that he never failed to repair Plaintiffs' air conditioning unit and no other tenants received new units during that time. DeAlba Aff. at ¶ 7. The repair of Plaintiffs' phone line took approximately 3 weeks, but Plaintiffs presented no evidence that any other tenant had any problems with a phone line, or received different treatment with respect to repairs. Because Plaintiffs cannot show that other individuals outside the protected class received different treatment, Plaintiffs' § 3604(b) claim cannot survive summary judgment.

### C. 42 U.S.C. § 3604(c)

Plaintiffs argue in Count III of the Complaint that Defendants violated 42 U.S.C. § 3604(c) through Danca's discriminatory statements. Section 3604(c) makes it unlawful:

> (c) To make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, handicap, familial status, or national origin, or an intention to make any such preference, limitation, or discrimination.

42 U.S.C. § 3604(c). The HUD regulations interpreting § 3604(c) extend the scope of the section to include oral statements made in connection with sale or rental of property. *See* 24 C.F.R. § 100.75(b) ("The prohibitions of [§ 3604(c)] shall apply to all written or oral notices or statements

by a person engaged in the sale or rental of a dwelling"); *see also Harris v. Itzhaki*, 183 F.3d 1043, 1055 (9th Cir. 1999) (affirming that statements can be oral as well as written). Those statements, however, must be made in connection with the sale or rental. *See Harris*, 183 F.3d at 1055 (a "stray remark" that is "wholly unrelated to the decision making process" is not actionable under § 3604(c)); *see also Campbell v. Robb*, 162 Fed. Appx. 460 (6th Cir. 2006) (discussing the difference under § 3604(c) between racial slurs alone, and racial slurs in the context of a decision to sell or rent); *Jancik v. Dept. of Housing and Urban Dev.*, 44 F.3d 553 (7th Cir. 1995) (permitting consideration of oral statements that were made by the defendant during an interview for housing).

Plaintiffs point to the statements made by Danca in 1995 and 2001 to support a claim that Danca made statements indicating preference for one race over another. Even assuming all the statements attributed to Danca are accurate, however, none of the statements that are attributed to Danca are statements made in connection with the sale or rental of the property. Danca may have been the housing manager of the apartment complex, and the statements made by Danca about the Kriemans may have been personally offensive, but the record contains no allegation that any of the statements were made in connection to access to housing. Like the claims under § 3604(a), the claims against Defendants for discriminatory statements are not tied to a denial of access to housing, or to the sale or rental of housing generally, and therefore cannot survive summary judgment.

### D.  Count IV - § 3617

Plaintiffs make two types of claims under 42 U.S.C. § 3617 - a claim of general interference with enjoyment of the property, and a claim that the interference was retaliatory because Plaintiffs made complaints about discriminatory treatment. The analysis of each of the claims are substantially similar.

<u>1. Interference under § 3617</u>

Plaintiffs first make a general allegation that the actions of Defendants constitute "interference with enjoyment" in their property. Section 3617 states in relevant part:

> It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title.

42 U.S.C. 3617. HUD has published its interpretation of the scope of §3617 in 24. C.F.R. §100.400. That regulation states that § 3617 prohibits, among other things:

> (2) Threatening, intimidating or interfering with persons in their enjoyment of a dwelling because of the race, color, religion, sex, handicap, familial status, or national origin of such persons, or of visitors or associates of such persons.

24 C.F.R. §100.400(c)(2). In light of this regulation, the Seventh Circuit has recently agreed with sister circuits that contrary to the language of § 3617, there need not be a violation of 42 U.S.C. §§ 3603-3606 in order to establish a violation of § 3617. *See Halprin v. Prairie Single Family Homes of Dearborn Park Ass'n*, 388 F.3d 327, 330 (7th Cir. 2004) (finding that 24 C.F.R. §100.400(c)(2) "cuts section 3617 loose from section 3604, contrary to the language of 3617"); *East-Miller v. Lake County Highway Dept.*, 421 F.3d 558, 562 (7th Cir. 2005) (accepting the viability of a § 3617 claim post-purchase in light of HUD interpretation).

To survive summary judgment on a § 3617 claim for interference, the plaintiff must be able to show: 1) that she is a protected individual under the FHA; 2) she was engaged in the exercise or enjoyment of her fair housing rights; 3) Defendants were motivated in part by an intent to discriminate, or their conduct produced a disparate impact; and 4) Defendants coerced, threatened, intimidated, or interfered with Plaintiff on account of her protected activity under the FHA. *East-*

15

*Miller*, 421 F.3d at 563. "A showing of intentional discrimination is an essential element of a § 3617 claim." *Id.* at 563; *see also Walton v. Claybridge Homeowners Ass'n. Inc.*, 2004 WL 192106, *8 (S.D. Ind. 2004) (stating that the plaintiff alleging § 3617 interference must "provide sufficient evidence that the conduct was racially-motivated to survive at summary judgment.")

Plaintiffs can show that they can meet the first and second elements of the § 3617 claim. Plaintiffs, through Anthony, are members of a protected class, and were engaged in the exercise or enjoyment of their fair housing rights. Defendants argue that Plaintiffs' only official act to exercise housing rights is the complaint to HUD filed in 2002, after the events in question occurred. Plaintiffs do not allege any filings, testimony, or participation in a proceeding before the FHA prior to 2002. But drawing all inferences in favor of Plaintiffs, Plaintiffs placed Defendants on notice of their awareness of the potentially discriminatory nature of Danca's actions in 2001 when they asked EPM to investigate Danca's discriminatory conduct. Morse Aff. at ¶ 28. Plaintiffs were exercising their fair housing rights.

Plaintiffs has provided supporting evidence of that Danca was motivated by an intent to discriminate sufficient to pass summary judgment. The Seventh Circuit has equated the showing of intentional discrimination under § 3617 with the intentional discrimination test used in the employment context. *East-Miller*, 421 F.3d at 563. A plaintiff may establish the existence of discriminatory intent either through direct evidence, circumstantial evidence, or the burden-shifting *McDonnell-Douglas* test. *East-Miller*, 421 F.3d at 563, *quoting Kormoczy v. Secretary, U.S. Dept. of Housing and Urban Dev.*, 58 F.3d 821, 823, 824 (7th Cir. 1995). "Direct evidence is that which can be interpreted as an acknowledgment of the defendant's discriminatory intent." *Kormoczy*, 53 F.3d at 823-24.

In this case, the alleged statements made by Danca, as testified by Plaintiffs and by the affidavits of Mr. Holleran and Mr. Warren, do establish a genuine issue of material fact as to Danca's discriminatory intent toward Plaintiffs. Plaintiffs testified that on numerous occasions, Plaintiffs each heard Danca making derogatory statements about Anthony Krieman's race to other residents of the apartment complex. Mr. Holleran, a neighbor and acquaintance of Plaintiffs, also testified that he heard Danca make derogatory statements about Anthony Krieman's race. Holleran Aff. at ¶¶ 6-7. Mr. Warren also testified that upon meeting with Danca concerning the rent payments in January 2001, Danca made derogatory statements in reference to Anthony Krieman's race. Warren Aff. at ¶ 4. While a jury might not credit these statements as truthful or find them sufficient to demonstrate a discriminatory motive, Plaintiffs have establish such facts as a reasonable jury could find that Danca harbored discriminatory intent toward Plaintiffs.

On the last element of the *East-Miller* test, however, Plaintiffs cannot show that Danca interfered with their enjoyment of the property. Several courts in this district have held § 3617 inference claims to a high standard of egregiousness. *See, e.g.*, *Whisby-Myers v. Kiekenapp*, 293 F. Supp. 2d 845 (N.D. Ill. 2003) (detonating explosives combined with racial slurs sufficient to proceed under § 3617); *Johnson v. Smith*, 810 F. Supp. 235 (N.D. Ill. 1992) (cross-burning and breaking windows of plaintiff's home sufficient to proceed under § 3617). Plaintiffs allege three main acts by Danca that interfered with their enjoyment of their housing: she attempted to require a credit check in 2001 but did not succeed, she did not take steps to stop the eviction in 2001 which was later settled, and she delayed maintenance requests in 2002.[3] Plaintiffs rely almost solely upon the

---

[3] Plaintiffs make other allegations that are unsupported by the record, such as deliberate towing of a car, cutting down a tree, and refusing use of a picnic table. As the only support for these events derives from Plaintiffs' depositions, and the depositions are inconsistent between

statements made about Anthony Krieman in 1995 and 2001 to support their claims that each of the acts in subsequent years were acts of discriminatory interference. While the statements attributed to Danca undoubtedly were personally offensive to Plaintiffs, and show a motive to discriminate, the record does not support a finding that the acts themselves were acts of interference.

Plaintiffs have not provided supporting evidence to rebut Defendants' assertion, supported by the record, that Danca did not have the power to control either Plaintiffs' continued tenancy, or the timeliness of service. Danca and Kevin Morse (Danca's supervisor) both testified that it was a general policy of the apartment complex that maintenance requests be placed in writing. Morse Aff. at ¶ 20; Danca Aff. at ¶ 23. Plaintiffs admit that they did not place all requests in writing for their maintenance problems. Darlene Krieman at 67; Bridget Krieman Dep. at 94-95. While maintenance services may have been delayed by a few days, the record contains no supported evidence that Danca delayed the services; to the contrary, the affidavit of the maintenance employee Jamie DeAlba indicates that he answered all requests on the day he received them. DeAlba Aff. at ¶ 5, 9. The record also contains explanations for the delay in services that do not involve Danca at all; such as ordering maintenance parts and clearing maintenance costs with EPM. DeAlba Aff. at ¶ 10, 13, Morse Aff. at ¶ 31.

As for the attempts to evict Plaintiffs, Kevin Morse testified that Danca had no discretion concerning the eviction of tenants. Morse Aff. at ¶ 10. According to the procedures for eviction common to all apartments owned by EPM, Danca followed the procedures of the apartment complex in giving notice of the late rent in 2000, in waiting the requisite number of days to allow payment, and in forwarding the action to Defendants' legal counsel after appropriate period. Def. 56.1 at ¶¶

Plaintiffs, the Court does not address these allegations.

30-31; Morse Aff. at Ex. 1. The record contains no evidence that Danca, a housing manager and not a lawyer, had any power to stop the eviction proceedings once ongoing, or that she initiated the proceedings early or personally pursued them. It may well be the case that Danca did not mind that an eviction action proceeded against the Kriemans, but her feelings about the matter are not relevant when her actions were consistent with the actions taken against all residents, regardless of race, as set forth in the terms of her employment.

### 2. Retaliation under § 3617

Plaintiffs rely on the same set of evidence as the interference claim as evidence that Danca's actions were retaliatory for Plaintiffs' complaints about housing discrimination. The HUD interpretation of § 3617, 24 C.F.R. § 100.400, explains that it is unlawful under § 3617 to "Retaliat[e] against any person because that person has made a complaint, testified, assisted, or participated in any manner in a proceeding under the Fair Housing Act." 24. C.F.R.§ 100.400(c)(5).

The Seventh Circuit has not created a specific test for retaliation under § 3617. The Eighth Circuit *prima facie* test for retaliation under § 3617 requires a plaintiff to show: (1) that they engaged in a statutorily protected activity; (2) that an adverse action was taken against them; and (3) that a causal connection exists between the adverse action and the protected activity. *Neudecker v. Boisclair Corp.*, 351 F.3d 361, 364 (8th Cir. 2003). The elements of the Eighth Circuit test for retaliation parallel the elements of the *East-Miller* test for interference with enjoyment; in essence, Plaintiffs must be able to show adverse action against them, and a causal connection between the housing complaint and the adverse action. Defendants admit that the decision to require all maintenance requests to be made in writing was put in place after Plaintiffs filed a complaint about discrimination, but there is no allegation that the policy of requiring written requests was not

enforced equally against all residents. For the reasons stated above in reference to interference with enjoyment, Plaintiffs have not provided supported evidence that the actions of Danca were retaliation for Plaintiffs' complaints about discrimination.

## E. Count V - Hostile Housing Environment

Finally, Plaintiffs claim that the statements and actions of Danca created a hostile housing environment for Plaintiffs. This circuit has recognized the existence of a "hostile housing environment" claim. *See DiCenso v. Cisneros*, 96 F.3d 1004 (7th Cir. 1996) (addressing the merits of an appeal from a HUD administrative ruling on a claim of hostile housing environment). The test for a hostile housing environment, where adopted, follows the Title VII standard for a hostile work environment. *See id.* at 1008. To show a hostile housing environment, the Plaintiffs must show: (1) they are members of a protected class; (2) they were subject to unwelcome harassment; (3) the harassment was based on the protected status; (4) the harassment was sufficiently severe or pervasive to deprive them of their right to enjoy their home; and (5) Defendants knew or should have known of the harassment in question and failed to take prompt remedial action. *Neudecker v. Boisclair Corp.*, 2005 WL 1607409, *1-2 (D. Minn. 2005) (hostile housing environment for disability). In the housing context, "a claim is actionable when the offensive behavior unreasonably interferes with use and enjoyment of the premises." *See DiCenso*, 96 F.3d at 1008, *citing Honce v. Vigil*, 1 F.3d 1085, 1090 (10th Cir. 1993).

Plaintiffs argue that Defendants overstate the degree of emphasis to be placed on the frequency and the severity of the conduct at issue. But the *DiCenso* court suggested frequency, severity, physical threats versus offensive utterances, and unreasonable interference as factors to consider in determining whether an environment is "hostile," and specifically noted that the

"frequency of the offensive behavior" was a common factor in hostile work environment claims. *See DiCenso*, 96 F.3d at 1008. The standards are demanding: "to be actionable, conduct must be extreme and not merely rude or unpleasant." *Neudecker*, 2005 WL 1607409 at *2; *Chalmers v. Quaker Oats Co.*, 61 F.3d 1340, 1345 (7th Cir. 1995) ("Though sporadic behavior, if sufficiently abusive, may support a [discrimination] claim, success often requires repetitive misconduct.")

As discussed in the previous sections, while the statements made in 1995 by Danca certainly suggest that Danca personally disliked the Kriemans and harbored racial animosity toward Anthony, the record does not show a causal connection between Danca's motivations and the acts of which Plaintiffs complain. The one incident that can be attributed to Danca, and not to other general policies of the apartment complex applied to all races, or to circumstances beyond Danca's control, is the letter demanding the credit check in 2001 after Plaintiffs lost their housing subsidy. Although one incident can support an actionable claim, courts consider whether the action was objectively and sufficiently egregious. *DiCenso*, 96 F.3d at 1009 (single act of landlord asking for sex as rent payment not sufficiently egregious to create an actionable claim of a hostile housing environment). When Plaintiffs questioned the motivation behind the credit check, EPM informed them that they did not need to complete the credit check, and Plaintiffs never submitted any money or information, and the issue was resolved within one week. While Plaintiffs undoubtedly found Danca's racial statements to be unpleasant, the statements alone without acts do not create an objectively hostile housing environment.

### The other Defendants

Plaintiffs' Complaint alleges that each of the discriminatory acts were committed by Danca, and that the other Defendants are liable through the actions of Danca as their agent, or through their

negligence in failing to respond to Danca's discriminatory acts. Because Plaintiffs cannot establish a genuine issue of material fact as to the claims of discrimination against Danca, the Court does not consider any further the claims of the knowledge or actions of the other Defendants.

THEREFORE, because Plaintiffs cannot establish the required elements for each of the claims presented, summary judgment is entered in favor of Defendants on all counts.


So Ordered.

_____
Virginia M. Kendall, United States District Judge
Northern District of Illinois

Date: May 31, 2006